# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| CELIA L. WARR-HIGHTOWER, individually and on behalf of all others similarly situated,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>ILLINOIS CENTRAL COLLEGE,  )<br>)<br>Defendants.  )<br>) | Case No.<br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT

Plaintiff Celia L. Warr-Hightower ("Hightower"), by and through her attorneys, on behalf of herself and all others similarly situated, for her Complaint against the Defendant Illinois Central College ("ICC"), and alleges as follows:

### JURISDICTION AND VENUE

1.  Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and 42 U.S.C. § 1983. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

2.  Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). Defendant ICC does business in this District and maintains offices in this District, and the unlawful conduct alleged in this Complaint occurred in this District.

### PARTIES

3.  Defendant Illinois Central College ("ICC"), is an Illinois Community College located in East Peoria, Illinois. ICC serves several Illinois cities including Peoria, Pekin, Morton, Washington, Farmington, Minonk, and Hanna City. ICC has 3 college campuses, in East Peoria,

Peoria, and Pekin, Illinois. In total, ICC employs 1,048 employees across three campuses.

4. Plaintiff Celia Hightower, a resident of Illinois, is an African American and has been employed by Defendant from 2011 until the present. Despite her excellent job performance at ICC, and despite ICC's acknowledgement that she was qualified for a promotion, ICC repeatedly selected less qualified white employees for supervisory positions to which Hightower applied. After Hightower complained about being passed over for the positions, and being subjected to unfair racial stereotypes, ICC mounted a campaign of retaliation and harassment against her. Throughout her tenure, and pursuant to Defendant's pattern or practice of discrimination against African-Americans, Hightower was denied promotions, denied equal pay, retaliated against, and otherwise treated worse than similarly situated ICC employees who are not African-American. Hightower has lost income and otherwise been harmed as a result of ICC's unlawful conduct.

## FACTUAL ALLEGATIONS

**Hightower Performs Well And Her Retiring Supervisor Recommends Her For Promotion**

5. Hightower has strong academic credentials. She obtained a bachelor's degree in psychology in 1996 and a master's degree in human development and counseling in 2007 from Bradley University. She is currently working towards her Doctorate in Education from Illinois State University.

6. ICC hired Hightower in 2011, for a part-time position as a Health Career Advisor. In 2012, ICC hired Hightower on a full-time basis as a "Counselor and Advisor." Hightower has served in that role ever since.

7. Hightower's job performance has been excellent. In her role, Hightower is responsible for, among other things, counseling students at ICC. Students consistently give her

2

extremely high marks for her counseling abilities.

8. In late 2014, Hightower's supervisor announced her retirement. While working for this supervisor, Hightower had consistently received excellent performance reviews. The supervisor told Hightower she would be a perfect replacement to take over her role and said she would recommend Hightower for the position.

9. Hightower decided to apply for the promotion, which came with a substantially higher salary.

**A Less Qualified White Woman Is Chosen For The Position**

10. Hightower participated in several interviews for the higher position in early 2015.

11. After the final interview, the Vice President of Student Services, Tracy Morris ("Morris") – the highest-ranking person on the panel interviewing the candidates – asked to speak with Hightower one-on-one, outside of earshot of the rest of the panel. Morris tried to convince Hightower that she didn't really want to obtain the new position, because Hightower really enjoyed counseling and interacting with students. Morris's paternalistic statement was consistent with ICC's policy and practice of imposing a "glass ceiling" on African-American employees, denying them promotions for which they were qualified.

12. The Vice President did not have similar one-on-one conversations with the two other people – both white – who were under consideration for the job.

13. Of course, Hightower *did* want the job she had applied for, as well as the additional salary and responsibility that would come with the promotion.

14. Ultimately, ICC selected a less qualified white woman, Emily Points ("Points") for the role. Unlike Hightower, Points had no experience in counseling; rather, she served as ICC's women's soccer coach and was involved in enrollment. She had no relevant education –

3

her bachelors and master's degrees were in physical education and sports management. She had not been recommended by Hightower's previous supervisor. Nonetheless, ICC selected her for the role.

15. Morris informed Hightower that, although Hightower was qualified for the role, ICC had selected Points instead. Later that day, Hightower learned that Morris had instructed campus police to be "on guard," because Morris believed Hightower might react angrily to learning that she had not gotten the job.

16. Hightower was offended that Morris, and ICC, had stereotyped her as an "angry black woman." The next day, she visited ICC's Chief of Police to voice her displeasure with the suggestion that she needed to be watched closely by the police. Soon after, Morris showed up at Hightower's office and accused her of being "angry" and stating that Hightower had to "move on."

17. Shortly after being awarded the new position, Points gave Hightower a lower performance rating than she had received in previous years. Hightower submitted a point-by-point rebuttal to Points' critiques and asked Points for suggestions about how to improve her performance. Points never responded or offered further feedback. The lower performance review, in fact, was nothing more than a pretextual post-hoc justification for ICC's discriminatory decision not to promote Hightower.

**Another Promotion Opportunity Comes Available; Again Hightower Is Rejected**

18. In September 2015, a new position – Director of Counseling – came available.

19. As a highly educated, highly successful, highly reviewed Counselor and Advisor, Hightower was extraordinarily well-qualified for this position. Indeed, she had served successfully as interim Director of Counseling. Nonetheless, contrary to ICC's practice for other

open positions for which there were qualified internal candidates (including the earlier position), ICC elected to interview outside candidates for this position.

20.     Again, after interviewing, Hightower was denied this promotion. Instead, ICC hired a white woman from outside the organization for this role.

21.     Hightower came to realize that ICC was determined to limit her to her role as a Counselor and Advisor, and would not promote her. She raised concerns – about her repeated rejection for promotions she was qualified for and her supervisors' unfair stereotyping of her as an "angry black woman" – to various high-level officials at ICC, including the head of human resources, the head of diversity, and the College President. No one at ICC addressed her concerns.

**ICC Orchestrates A Campaign of Retaliation And Harassment Against Hightower**

22.     Ever since she was rejected for the first position and complained to the Chief of Police, and continuing to the present day, ICC has continued to discriminate against her and has retaliated against her for complaining of racial discrimination.

23.     For example, ICC: (a) denied Hightower a standard raise for the first time, even though her two colleagues, both white, received the raise; (b) disciplined Hightower for engaging in identical conduct as one of her white colleagues, and then refused to meet with Hightower to address the purported infraction; (c) denied Hightower vacation days that her white colleagues were allowed to take; (d) denied Hightower tuition reimbursement for her Ph.D. program that her white colleagues received; (e) forced Hightower to do training off of work hours; (f) transferred Hightower to a smaller campus, despite her preference to continue working where she was; (g) refused to assist Hightower after numerous personal items, including her diversity posters, were stolen by an ICC employee from her locked office.

24. Moreover, until Hightower began actively seeking a promotion in late 2014 and early 2015, she consistently received excellent performance reviews from her supervisors. Only after she sought promotion to higher positions – positions that ICC decided to give to white people, instead – did Hightower's supervisors begin giving her worse performance reviews. These more recent performance reviews were retaliatory and designed to retroactively and pretextually justify ICC's decision to hire white people for the roles Hightower applied for.

25. In these and other ways, ICC has discriminated against Hightower and retaliated against her for complaining of racial discrimination.

26. On August 16, 2016, Hightower filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination and retaliation. The EEOC has issued Hightower a notice of right to sue.

**ICC's Pattern And Practice Of Discrimination**

27. In sum, Defendant has and is engaged in an ongoing pattern and practice of race discrimination and knowingly employs campus-wide policies and practices that are intentionally discriminatory and have a disparate impact on African Americans. Defendant's systemic discrimination against African Americans includes, but is not limited to, the following practices:

a) failing to hire African American and employing discriminatory hiring policies and practices;
b) employing discriminatory training policies and practices;
c) employing discriminatory compensation policies and practices;
d) employing discriminatory policies and practices regarding job assignments, performance evaluations, advancement, and promotion;
e) employing policies and practices regarding the assignment of resources and business opportunities that favor whites and harm African Americans;
f) employing policies and practices that disproportionately disadvantage African American and/or that reinforce, amplify, and continue past discrimination or societal bias;


g) failing to apply and enforce ICC policies in a consistent, race neutral fashion, to the detriment of African American employees;

h) retaliating against African Americans who complain of discrimination; and

i) employing policies and practices that have a disparate impact against African Americans.

28. The intentional and pattern or practice discrimination described above is ongoing and constitutes a continuing violation of the civil rights laws. The racially discriminatory policies and practices at ICC are uniform across all three campuses. These policies and practices constitute both disparate treatment and disparate impact under Title VII of the Civil Rights Act.

29. All of ICC's actions described in the Complaint were under color of law.

## CLASS ALLEGATIONS

30. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

31. The class of African American employees and former employees is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

32. There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

33. The claims alleged by Plaintiff are typical of the claims of the class members. Fed. R. Civ. P. 23(a)(3).

34. Defendant's discrimination has caused harm to African Americans, including lower pay, unfair employment reviews, excessive discipline, denial of promotion, job segregation and steering of African Americans to maintenance jobs or other similar positions and higher attrition.

35. Plaintiff will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

36. The issues of determining liability and equitable relief, among other issues are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

37. The proposed class also meets the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

## COUNT I

### EQUAL PROTECTION VIOLATION OF
### 42 U.S.C. § 1983
### (Classwide)

38. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

39. ICC had a widespread practice of racial discrimination in hiring, promotion, pay, evaluations, and discipline, that, although not authorized by written law or express municipal policy, is so well settled as to constitute a custom or usage with the force of law. Further, the discriminatory decisions regarding hiring, promotion, pay and discipline were made by persons with final decision-making authority or ratified by such persons.

40. The Equal Protection Clause prohibits discrimination on the basis of race, as enforced through 42 U.S.C. Section 1983.

41. Plaintiff and all similarly situated individuals were deprived of their right to be free from racial discrimination in their employment with ICC.

42. By its conduct as alleged in this Complaint, ICC violated the Equal Protection Clause and 42 U.S.C. Section 1983.

## COUNT II

### RACE DISCRIMINATION UNDER TITLE VII
### (Classwide)

43. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

44. Plaintiff filed charges of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"). ICC was placed on notice of the representative allegations contained in this Complaint in the EEOC charges. Plaintiff has received a Notice of Right to Sue from the EEOC.

45. Title VII of the Civil Rights Act of 1964 and amendments thereto make it an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms or conditions, or privileges of employment, because of such individual's race, color, or national origin; or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, or national origin.

46. Through the conduct alleged in this Class Complaint, ICC violated Title VII of the Civil Rights Act of 1964 and amendments thereto by subjecting Plaintiffs and all others similarly situated to differential treatment and by adopting and maintaining policies and practices that had a disparate impact against African-Americans.

47. ICC is responsible for the acts and conduct of its managers and knew of or should have known of a culture created by its managers and employees that discriminated against and was hostile to African-American employees.

## COUNT III

### RETALIATION UNDER TITLE VII
### (Classwide)

48. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

49. Title VII, specifically 42 U.S.C. 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

50. Plaintiff complained of racial discrimination. After Plaintiff complained, she was subjected to adverse action, including but not limited to being rejected for promotions, being refused raises, being written up for non-existent disciplinary violations, being denied vacation time, being denied tuition reimbursement, and being transferred to a less desirable location.

51. ICC has a pattern and practice of retaliating against individuals who complain of racial discrimination, and Plaintiff brings this claim on behalf of all similarly situated individuals.

52. By its conduct, ICC subjected Plaintiff to unlawful retaliation in violation of Title VII to her loss and detriment.

**WHEREFORE**, Plaintiff requests the entry of judgment in her favor, on behalf of a class of similarly situated individuals, and against ICC as follows:

   a. Declare that the acts and conduct of ICC are unlawful and violate Title VII and 42 U.S.C. § 1983;

   b. Award Plaintiff, and all others similarly situated, the value of all compensation and benefits lost as a result of ICC's unlawful conduct;

   c. Award Plaintiff, and all others similarly situated, the value of all compensation and

  benefits they will lose in the future as a result of ICC's unlawful conduct;

 d. Award Plaintiff, and all others similarly situated, compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

 e. Award Plaintiff, and all others similarly situated, punitive damages due to ICC's malicious conduct and/or ICC's reckless or callous indifference to their statutorily protected rights;

 f. Award Plaintiff, and all others similarly situated, prejudgment interest;

 g. Award Plaintiff, and all others similarly situated, attorneys' fees, costs, and disbursements; and

 h. Award Plaintiff, and all others similarly situated, such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

         Respectfully Submitted,

         *s/ J. Bryan Wood*

| | |
|---|---|
| J. Bryan Wood | Linda D. Friedman |
| THE WOOD LAW OFFICE, LLC | Suzanne Bish |
| 303 W. Madison Street, Suite 2650 | Matthew J. Singer |
| Chicago, Illinois 60606 | STOWELL & FRIEDMAN, LTD. |
| Phone: 312-554-8600 | 303 W. Madison, Suite 2600 |
| Fax: 312-577-0749 | Chicago, Illinois 60606 |
| | Phone: 312.431.0888 |
| | Fax:    312.431.0228 |